UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WESTMONT DEVELOPMENT GROUP,
LLC

        Plaintiff,

   v.

TOWNSHIP OF HADDON, MAYOR
RANDALL W. TEAGUE,
COMMISSIONER JOHN C. FOLEY,
COMMISSIONER PAUL DOUGHERTY,
and CAMDEN COUNTY IMPROVEMENT
AUTHORITY,

        Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 07-5846
(JEI/JS)

**OPINION**

**APPEARANCES:**

David T. Shulick, Esq.
1635 Market Street
19th Floor
Philadelphia, PA 19103
    Counsel for Plaintiff

BROWN & CONNERY, LLP
By: William M. Tambussi, Esq.
    Christopher A. Orlando, Esq.
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108
    Counsel for Defendants Township of Haddon, Mayor Randall W.
    Teague, Commissioner John C. Foley, and Commissioner Paul
    Dougherty

ARCHER & GREINER, PC
By: Vincent P. Sarubbi, Esq.
    Jenean E. Kirby, Esq.
    Kenneth J. Lackey, Esq.
One Centennial Square
Haddonfield, NJ 08033
    Counsel for Defendant Camden County Improvement Authority

**IRENAS**, Senior District Judge:

This is an action by Plaintiff Westmont Development Group ("WDG") alleging Breach of Contract, Breach of the Duty of Good Faith and Fair Dealing, and Negligent Misrepresentation by Defendants Township of Haddon, Mayor Randall W. Teague, Commissioner John C. Foley, Commissioner Paul Dougherty (collectively "Township Defendants"), and Camden County Improvement Authority ("CCIA").

Presently before the Court are Motions for Summary Judgment and to Dissolve Temporary Restraints by the Township Defendants, and a Motion to Dismiss by CCIA.  For the reasons stated below, the Court will grant Defendants' Motions.[1]

<p style="text-align:center">I.</p>

The Township of Haddon ("Township") is a municipality in Camden County, New Jersey, governed by a Board of three Commissioners, one of whom is designated as the Mayor.  (Pl.'s 56.1 Stmt.[2] ¶ 1)  The Township also has a Planning Board, which is an independent governmental body from the Township.[3]  (Twp. Defs.' Ex. 9-- Donald C. Cofsky Dep. 6:19-20)

---

[1] The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  Venue is proper in this Court under 28 U.S.C. § 1391(a).

[2] References to "56.1 Stmt." pertain to the statements of material facts submitted by WDG and the Township Defendants pursuant to Local Civil Rule 56.1.

[3] One Township Commissioner also sits as a member of the Planning Board. (Pl.'s 56.1 Stmt. ¶ 10)  The remaining members of the Planning Board are appointed by the Township's Mayor.  (Twp. Defs.' Ex. 9-- Donald C. Cofsky Dep. 6:19-22)

This litigation pertains to a failed contract between the Township and WDG for the redevelopment of the "Westmont Theater property," — a tract which is part of the physical and emotional "heart" of the Township.  (Twp. Defs.' Ex. 1 (Attach. A)-- Redevelopment Plan 3, 8-9)

Section I, Part A discusses events preceding the execution of the redevelopment contract by the Township and WDG; Part B focuses on the parameters of that contract, and WDG's performance thereunder; Part C addresses WDG's struggle to obtain adequate parking to support its redevelopment plans; Part D describes the negotiations by WDG and the Township to amend the original redevelopment contract; Part E discusses the change in Township leadership that occurred in May, 2007, and the resultant impact on WDG; and Part F summarizes the procedural history in this matter to date.

**A.**

The background of this litigation begins with a November, 1998, purchase-leaseback agreement between the Township and the CCIA for the Westmont Theater property.[4]  (See Twp. Defs.' Ex. 1 (Attach. B)-- Lease Purchase Agreement)  Pursuant to that agreement, the Township transferred title to the Westmont Theater property to the CCIA.  (See Twp. Defs.' Ex. 1 (Attach. B)-- Deed

---

[4] As described in that agreement, the CCIA is an entity created by the Camden County Board of Freeholders, and authorized to assist municipalities with financing public projects.  (Twp. Defs.' Ex. 1 (Attach. B)-- Lease Purchase Agreement 1)

of Sale, Nov. 17, 1998; Pl.'s Ex. 12-- Catherine M. Ward Dep. 19:2-6)  In return, the CCIA provided financing to the Township for improvements on the theater.  (Lease Purchase Agreement 1; Ward Dep. 19:6-9)  The CCIA funded the project by issuing $700,000 in bonds.  (Lease Purchase Agreement 1; see Ward Dep. 19:14-15, 20:6-9)  The CCIA leased the property back to the Township, thus the Township retained physical control of the premises.  (Ward Dep. 19:9-11)  The agreement provided for the Township to repurchase the theater from the CCIA once the bonds were fully repaid.  (Lease Purchase Agreement § 5.9; Ward Dep. 19:11-13)  For present purposes, the key consequence of the purchase-leaseback agreement is that CCIA currently holds title to the Westmont Theater.  (See Pl.'s 56.1 Stmt. ¶ 3)

On November 26, 2002, the Township adopted a "Redevelopment Plan" which called for the redevelopment of an area known as the "Haddon Avenue corridor."  (Pl.'s 56.1 Stmt. ¶ 2)  Described generally, the Redevelopment Plan was intended to "create and recreate a mix of uses and generalized environment that will encourage . . . the pedestrian shopping, dining and entertainment experience."  (Twp. Defs.' Ex. 1 (Attach. A)-- Redevelopment Plan 4)  The plan identified three major redevelopment sites as comprising the Haddon Avenue corridor: (1) Parcel "A" - the Dy-Dee Site; (2) Parcel "B" - the Russell Stone property; and (3) Parcel "C" - the Westmont Theater property.  (Redev. Plan 7-9)

4

When the Redevelopment Plan was adopted, as now, a vacant theater sat on the Westmont Theater property. (See Redev. Plan 8-9) The plan designated the Township Commissioners as the entity to implement its provisions, and authorized the Township to contract with a redeveloper, if necessary to achieve implementation. (Redev. Plan 13)

In 2003, Joanna Pang, a principal of WDG,[5] was seeking a location suitable for opening a new live entertainment venue, and became interested in the Westmont Theater as a potential site for that project. (Pl.'s Ex. 1-- Joanna Pang Dep. 61:15, 63:6-8) Pang was familiar with the entertainment industry from her role as President of Joon Associates, an entity which operated the Trocadero Theater in Philadelphia, Pennsylvania. (See Pang Dep. 23:19-25, 24:14-15, 25:12-25) An "introductory" meeting was arranged between Pang and William Park, then-Mayor of the Township, to gauge the Township's interest in Pang's idea for the theater. (Pang Dep. 61:8-18, 69:2-4) The Township subsequently instructed WDG to submit a formal concept plan for the proposed redevelopment of the Westmont Theater property. (Pang Dep. 74:20-75:4)

Under cover of letter dated December 4, 2003, WDG submitted

---

[5] The investors in WDG are Joanna Pang and her father, Stephen Pang. (Pl.'s Ex. 1-- Joanna Pang Dep. 49:21-24)

the requested "concept plan" to the Township.[6]  (Twp. Defs.' Ex.

1 (Attach. C)-- Concept Plan; Pang Dep. 75:5-6; see Pl.'s Ex.

24-- Township of Haddon Resolution No. 2004-055, May 18, 2004

("[T]he Redeveloper has proposed improvements to portions of the

Redevelopment area . . . as set forth in the concept plan

submitted to the Township dated December 4, 2003 . . . ."))  WDG

was subsequently appointed as the redeveloper for the parcel — a

precursor to formal contract negotiations between WDG and the

Township.  (Resolution No. 2004-055; Pang Dep. 78:3-7)

                              **B.**

     WDG and the Township entered into a "Redevelopment

Agreement" which became effective on May 26, 2004.  (Twp. Defs.'

Ex. 1-- Redevelopment Agreement)  A number of provisions in that

contract merit particular attention.  First, the contract

provided for a sixty day due diligence period, during which WDG

was to conduct any inspections necessary to determine whether it

wished to proceed forward with the agreement.  (Redev. Agreement

§ 3)  If WDG identified an unsatisfactory condition existed

during that period, it was permitted to terminate the agreement.

(Id.)

     Assuming that WDG did not terminate the agreement, it was

required to prepare and submit to the Township a proposed

---

     [6]  The concept plan included a textual introduction, along with sketches
of the structures that would constitute the project:  the theater itself, a
diner, a bookstore, a garden, a coffee shop, and a music store.  (See Twp.
Defs.' Ex. 1 (Attach. C)-- Concept Plan)

"Redevelopment Project Plan" by September 26, 2004.  (Redev.

Agreement § 4)   The term "Redevelopment Project Plan" was

defined as follows:

> those plans and specifications adequate to enable the
> Township to understand the scope of the planned
> Redevelopment and operation of the Westmont Theater as
> a live entertainment venue and shall include, at a
> minimum, the following: (i) a detailed Site Plan, as
> that term is defined in the Zoning Ordinance of Haddon
> Township; (ii) written description of proposed uses,
> including various seating capacities and types of
> entertainment acts to be presented at the Westmont
> Theater Property, including expected audience capacity
> for each type of event; (iii) traffic analysis showing
> adequate parking facilities (either on-site, off-site
> or both) for maximum seating capacity of the Westmont
> Theater . . .; and (iv) written description of
> proposals to minimize impact of light, noise, loitering
> and off-site parking impacts to the neighboring
> residential community.  The Redevelopment Project Plan
> shall also identify those lots within the Redevelopment
> Area, in addition to the Westmont Theater Property,
> that Redeveloper proposes to acquire and include within
> the Redevelopment Project . . . . .

(Redev. Agreement § 1(g))   The Township Commissioners were

required to review WDG's Redevelopment Project Plan within thirty

days of receipt, and either: (1) approve it, in which case WDG

would proceed with the redevelopment project or (2) advise WDG of

any reasons why the submitted plan was inadequate, and meet with

WDG to resolve any differences.  (Redev. Agreement § 4)

     The Redevelopment Agreement and an "Agreement of Sale"

attached thereto established the parameters for the eventual

conveyance of title to the Westmont Theater property to WDG.

(Redev. Agreement § 2; Twp. Defs.' Ex. 1 (Attach. D)-- Agreement

of Sale)   Pursuant to the Agreement of Sale, a condition precedent to that conveyance was the "consummation of the transaction contemplated in the Redevelopment Agreement." (Agreement of Sale § 6(b))   In addition, WDG was required to obtain "Preliminary and Final Site Plan Approval" from the Township prior to conveyance of the theater property.  (Agreement of Sale § 6(c))   The termination of the Redevelopment Agreement for any reason would result in the simultaneous nullification of the Agreement of Sale.   (Agreement of Sale § 6(b))

The redevelopment agreement identified eight events, the occurrence of which would constitute a default by WDG.  (Redev. Agreement § 11(a))   Those events included WDG's failure "to adhere to any time schedule or goal . . . unless otherwise extended pursuant to written agreement of the parties[]" or failure "to diligently pursue the redevelopment of the Westmont Theater Property[.]"  (Redev. Agreement § 11(a)(2),(3))   The agreement stated that the Township would be in default if it failed "to perform any of its obligations" under the contract. (Redev. Agreement § 11(b))

In the event of a default, the non-defaulting party was required to notify the defaulting party in writing.  (Redev. Agreement § 11(c))   Once such a notification was received, the defaulting party was permitted at least thirty days to effect a

cure.[7] (Id.) In the event of an uncured default, the non-defaulting party was permitted to terminate the Redevelopment Agreement. (Redev. Agreement § 12)

The Redevelopment Agreement provided that any alteration, amendment, or modification thereto was invalid unless memorialized in writing. (Redev. Agreement § 16(b)) Finally, the agreement stated that the failure of either party to insist upon strict performance of any term or obligation under the contract was not to be construed as a waiver or relinquishment of any terms or rights under the agreement. (Id.)

WDG did not exercise its right to terminate the Redevelopment Agreement during the due diligence period. (Pang Dep. 90:1-3, 90:12-14) Thus, WDG was required to submit a Redevelopment Project Plan to the Township by September 26, 2004, but it did not do so.[8] (Pang Dep. 152:18-153:4) Although WDG's failure to meet that deadline would constitute a default under the strict terms of the Redevelopment Agreement, the Township did not place WDG on notice of a default. Instead, a practice began

---

[7] More than thirty days was permitted to effect a cure if the default could not "with due diligence" be cured within thirty days. (Redev. Agreement § 11(c))

[8] Both Plaintiff and the Township Defendants indicate that WDG submitted a "concept plan" to the Township on December 4, 2004. (See Pl.'s 56.1 Stmt. ¶ 4; Twp. Defs.' 56.1 Stmt. ¶ 18) However, no document bearing that date appears in the exhibits, and neither party was able to direct the Court to such a document during oral argument. As memorialized in a Township resolution adopted on May 18, 2004, WDG did submit a concept plan to the Township on December 4, **2003**. (Pl.'s Ex. 24-- Township of Haddon Resolution No. 2004-055, May 18, 2004) No competent evidence in the record supports the proposition that WDG submitted a concept plan to the Township again on December 4, 2004.

that would persist throughout the term of the contract — time frames articulated therein were not adhered to, and the Township liberally granted WDG extensions of contractual deadlines. (See Pang Dep. 98:11-18, 103:17-104:1, 109:5-7, 110:6-9)  Those extensions were not memorialized in writing. (Pang Dep. 115:13-16)

Beginning in March, 2005, WDG initiated the process of obtaining a conceptual plan review of its site plans for the Westmont Theater property by the Township Planning Board. (See Pl.'s Ex. 15-- Mem. from Marc Shuster to Planning Board, Mar. 3, 2005)  To that end, WDG's engineers — Bach Associates — submitted "conceptual plans, dated March 2005," for review by Marc Shuster, planner for the Township's Planning Board. (Shuster Mem., Mar. 3, 2005)  Over the months that followed, correspondence generated by Bach Associates, Shuster, and Martin Sander of Schoor DePalma[9] indicated that the following documents were submitted by WDG for consideration by the Planning Board: (1) a "Site Plan Set" consisting of a Cover Sheet, Topographic Survey, Site Plan, Grading Plan, Landscape Lighting Plan, Detail Sheet, Conceptual First, Second, and Third Floor Plans, and Conceptual Front and Rear Elevations; (2) a Traffic Impact Study; and (3) Drainage Calculations. (See Pl.'s Ex. 19-- Ltr. from Martin Sander to

---

[9] Schoor DePalma was the engineer for the Planning Board during the pertinent time period. (See Twp. Defs.' Ex. 9-- Donald C. Cofsky Dep. 68:12-69:2)

Eleanor Connell, May 31, 2005; Pl's Ex. 29-- Mem. from Marc
Shuster to Planning Board, Jun. 1, 2005; Pl.'s Ex. 18-- Ltr. from
Martin Sander to Eleanor Connell, Jul. 5, 2005)  In response to
feedback from Shuster and Sander, Bach Associates submitted
revisions and additions to a number of those documents.[10]  (See
Pl.'s Ex. 16-- Ltr. from Bach Associates to Marc Shuster, Jun.
24, 2005; Pl.'s Ex. 17-- Ltr. from Bach Associates to Martin
Sander, Jun. 24, 2005)  No document in the record indicates that
the Planning Board ever reached a decision, either way, regarding
the merits of WDG's site plan.[11]

    Nor is there any indication that Bach Associates submitted
the above-described series of documents to the Township for
consideration by the Commissioners.  Ultimately, it appears WDG's
efforts to provide a putative "Redevelopment Project Plan" to the
Township were stymied by WDG's inability to identify an adequate
source of parking for the volume of patronage anticipated on the
theater property.[12]

_____

    [10] Also during this time period, WDG submitted a single-page application
to the Planning Board for a "Conceptual Review of Major Site Plan[.]" (Pl.'s
Ex. 13-- Township of Haddon- Planning Board Application)

    [11] The likely reason no decision was reached by the Planning Board is
that WDG failed to submit sufficient information to permit such a decision.
The last correspondence in the record from 2005 indicates that WDG still had
not submitted "management plans for Traffic, Security, and Parking" as of
September 21, 2005, even though those plans were requested from WDG during a
July 7, 2005 Planning Board meeting.  (Pl.'s Ex. 18-- Ltr. from Martin Sander
to Eleanor Connell, Sep. 21, 2005)

    [12] In various documents authored in 2005, both Shuster and Sander noted
the disparity between the parking needs of WDG's project and the parking
available on the Westmont Theater premises — and the resultant necessity for
substantial off-site parking.  (See Pl.'s Ex. 15-- Shuster Mem. ¶ 5; Pl.'s Ex.

11

**C.**

From the inception of the Redevelopment Agreement, both WDG
and the Township were aware that obtaining adequate parking for
WDG's project posed a challenge.  (Pang Dep. 173:12-174:17; Pl.'s
Ex. 3-- Kathy Hogan E-mail, May 3, 2006 ("Two years ago, we knew
we would have a big problem with parking for any large size plan
proposed for the Westmont Theater.  Stupidly, we approved the
idea for a large size plan anyway, in the complete absence of any
such viable parking plan."))  As Pang acknowledged, the
Redevelopment Agreement does not list the provision of parking
among the Township's responsibilities.[13]  (Pang Dep. 175:3-7)
However, according to Pang, the Township committed to working
collaboratively with WDG to address the parking issues attendant
to the Westmont Theater redevelopment project.[14]  (Pang Dep.

18-- Sander Ltr. 2, 4, 5;  Pl.'s Ex. 19-- Sander Ltr. 2; Pl.'s Ex 29-- Shuster
Mem. ¶¶ 4, 5)

   [13] By contrast, Pang conceded that the agreement calls for the
Redevelopment Project Plan submitted by WDG to include a "traffic analysis
showing adequate parking facilities."  (Pang Dep. 175:18-176:7)

   [14] Not all members of then-Mayor Park's administration were fully
cooperative with WDG's redevelopment efforts.  According to testimony by Pang
and Park, then-Commissioner Kathy Hogan was "difficult from the get-go" and,
at times, "vocally opposed" and "subversive" to WDG's project.  (Pang Dep.
277:24-25; Pl.'s Ex. 13-- William J. Park, Jr. Dep. 13:1-15)  In particular, a
negative comment about Pang was attributed to Hogan in an article published by
a local newspaper.  See Rick Murray, *Questions Raised Over Developer*, The
Haddon Herald, Sep. 29, 2005.  According to that article, Pang had
professional connections to a financial institution which was purportedly not
complying with federal money laundering laws.  *Id.*  The article states that
"Hogan, and a local ad-hoc group she heads up, have repeatedly complained that
[then-Mayor] Park and other township officials have not thoroughly checked out
developers lining up to build projects in the township's redevelopment
district along Haddon Avenue."
   For the most part, however, WDG provides no meaningful support for its
general allegation that Hogan "actually vocally opposed [WDG's] appointment as

174:7-10)

WDG's first idea regarding parking was for theater patrons to use the parking lot of the nearby Westmont PATCO Speedline station, with transportation from that lot to the Westmont Theater property to be provided by shuttle bus.  (See Pl.'s 56.1 Stmt. ¶ 36)  Pang contacted the Delaware River Port Authority, which operates the PATCO Speedline, to discuss this possibility.  (Pang Dep. 188:12-189:11)  WDG approached the Township Planning Board to discuss the PATCO parking lot idea, but the Planning Board was not receptive to that plan.  (Pang Dep. 190:9-15)  As a result, WDG did not contact the Delaware River Port Authority again.  (Pang Dep. 190:13-15)

The remainder of WDG's efforts to obtain parking centered on the "Russell Cast" property, identified in the Township's 2002 Redevelopment Plan as Parcel "B" of the Haddon Avenue Corridor redevelopment zone.  The complex history of the Russell Cast property predates the contract between WDG and the Township.  In 2001, a commercial entity known as Rose Hill Estates, LLC ("Rose Hill") purchased the undeveloped Russell Cast property from the Township.[15]  *Rose Hill Estates v. Twp. of Haddon*, 2006 WL

---

a Redeveloper and made public statements and took affirmative steps in a subversive manner to thwart [WDG's] plans."  (Pl.'s 56.1 Stmt. ¶ 33, O) Moreover, nothing in the Redevelopment Agreement precluded then-Commissioner Hogan from voicing her views publicly — even if those views were adverse to WDG.  Such conduct would not constitute a breach of the agreement.

[15] A cement factory previously occupied the Russell Cast property, but the factory was damaged by fire, and ultimately demolished by the Township. *Rose Hill Estates v. Twp. of Haddon*, 2006 WL 1912778, at *1 (N.J. Super. App.

1912778, at *1 (N.J. Super. App. Div. Jul. 13, 2006).  Beginning

in October, 2002, Rose Hill attempted to develop that tract for

residential use, but those efforts were frustrated by municipal

ordinances enacted under the administration of then-Mayor Park,

resulting in protracted litigation between Rose Hill and the

Township.[16]  *See id.* at *1-*3.

The Russell Cast property remained undeveloped in 2005, when

WDG began to pursue a meeting with Joseph Del Duca, general

counsel for Rose Hill.  (See Pang Dep. 190:20-191:24)  After a

"long process of getting ahold of Mr. Del Duca[,]" (Pang Dep.

191:13-14), representatives of WDG and Rose Hill met on February

13, 2006, to discuss an agreement whereby the Russell Cast

property would be used to provide parking for the Westmont

Theater property.  (Pl.'s 56.1 Stmt. ¶ 5; Del Duca Dep. 73:11-20)

_____

Div. Jul. 13, 2006).  At various points in the record, the "Walters Group" is
referred to as the owner of the Russell Cast property.  Rose Hill is one
company among a series of companies known collectively as the "Walters Group."
(See Pl.'s Ex. 4-- Joseph Del Duca Dep. 7:16-9:8)

[16] In October, 2002, Rose Hill applied for approval to construct a
sixty-six unit multi-family housing development.  *Rose Hill Estates*, 2006 WL
1912778, at *2. While the application was pending, then-Commissioners Park,
Hogan, and Broderick adopted a municipal ordinance that rendered Rose Hill's
proposed development project an impermissible use of the land, leading to the
denial of Rose Hill's application.  *Id.*  Rose Hill instituted litigation
against the Township in May, 2003, challenging the legality of the Township's
action.  *Id.*  In July, 2003, Rose Hill applied for approval to construct a 112
unit senior citizen multi-family development.  *Id.*  Again, while the
application was pending, the Township amended its ordinances to preclude the
use proposed by Rose Hill.  *Id.*  In April, 2004, Rose Hill amended its
Complaint in the action against the Township to include a challenge to the
legality of the Township's actions as to Rose Hill's second application.  *Id.*
The Township prevailed against Rose Hill at the trial court level in October,
2004, and again on appeal in a decision rendered on July 13, 2006.  *Id.* at *1,
*3.

14

Over the weeks and months following the meeting, WDG attempted to obtain either a leasehold or ownership interest in the Russell Cast property via negotiations with Rose Hill, but those efforts were rebuffed and no agreement was reached.[17]   (See Twp. Defs.' Ex. 13-- E-mail from David Shulick to Joseph Del Duca, Feb. 17, 2006 (proposing short term lease for Russell Cast property pending a permanent solution); Pl.'s Ex. 7 (Attach. Shulick-14)-- E-mail from David Shulick to Joseph Del Duca, Jun. 26, 2005 (proposing independent appraisal of the Russell Cast property, and a subsequent conveyance from Rose Hill to WDG at the appraised amount of the property); Del Duca Dep. 77:13-78:8, 81:12-82:17 (testifying to Rose Hill's lack of interest in WDG's proposals))  On July 24, 2006, Del Duca informed WDG that Rose Hill was in discussions with the Township concerning the possible sale of the Russell Cast property, and requested that WDG direct any further communications regarding the property to the Township, rather than to Rose Hill.  (Twp. Defs.' Ex. 16-- E-mail from Joseph Del Duca to David Shulick, Jul. 24, 2006; see Pang Dep. 243:15-17 ("[T]here was a point where [Rose Hill] made it

---

[17]  In March, 2006, Shulick communicated his dissatisfaction to Township officials regarding the negotiating position taken by Rose Hill.  (See Pl.'s Ex. 7 (Attachment Shulick-13)-- Ltr. from David Shulick to Catherine Ward, Mar. 24, 2006)  Therein, Shulick wrote that Rose Hill "refuse[d] to act in good faith or act reasonably."  (Id.)  According to the letter, Rose Hill was seeking a vastly overinflated sum of $10,000,000 for the Russell Cast property.  (Id.)  There is no indication that the Township interfered with the negotiations between WDG and Rose Hill or otherwise prompted Rose Hill to be intransigent.  In fact, during the time period in question, the Township and Rose Hill were adverse parties in ongoing state court litigation.

pretty clear that they were not interested . . . in negotiating a deal with [WDG].”))

Notwithstanding WDG's inability to obtain an interest in the Russell Cast property from Rose Hill directly, WDG anticipated that the Township would take steps to procure the property from Rose Hill for public use, including WDG's use.  (See Pang Dep. 245:3-10, 257:22-258:4; Shulick Dep. 71:11-21)  This belief apparently originated from the Township's completion of a parking study which indicated that the Russell Cast property was the most logical source of additional parking for the Township's downtown district.  (Pang Dep. 205:2-5; Pl.'s Ex. 11-- William J. Park Dep. 8:22-10:2)  WDG was told that the Township would obtain the Russell Cast land either by purchasing it or the exercise of eminent domain.[18]  (Pang Dep. 257:22-258:4)  However, the Township ultimately did not move forward with the acquisition of the Russell Cast property.

**D.**

During the time period in 2006 that WDG was struggling to find a solution to its parking needs, representatives of the Township suggested the possibility of amending the Redevelopment Agreement to permit WDG to accomplish the redevelopment in

---

[18] Township officials confirm considering the acquisition of the Russell Cast property, and communicating same to Pang.  (See Park Dep. 15:12-20; Ward Dep. 101:7-13; Pl.'s Ex. 5-- Randall W. Teague Dep. (Vol. II) 19:20-21:11)) However, then-Commissioner Kathy Hogan publicly voiced her objection to using eminent domain to address the Westmont Theater property's parking needs. (Amended Compl., Ex. B.-- E-mail from Kathy Hogan, Apr. 9, 2006)

phases.  (Ward Dep. 92:20-24; Pang Dep. 106:4-12, 115:16-23)  As explained by Pang, the first phase would involve the redevelopment of the property surrounding the theater, and the second phase would be the redevelopment of the Westmont Theater itself.  (Pang Dep. 124:23-125:4)  Pang testified that there was adequate parking available on the Westmont Theater property to accommodate the needs of the first phase.  (Pang Dep. 212:20-23)  WDG was hopeful that a solution to the parking needs of the Westmont Theater itself would have been identified prior to beginning the second phase of the redevelopment — Pang thought the Russell Cast property could be the source of that solution.  (Pang Dep. 213:3-23)

WDG and the Township reached a verbal agreement in concept as to the contours of the phased redevelopment plan.  (Pang Dep. 213:24-214:5; Shulick Dep. 80:24-81:1)  A written amendment to the Redevelopment Agreement was prepared, circulated, commented upon, and revised.  (Pang Dep. 93:18-24)  As of late 2006 or early 2007, it was WDG's understanding that the Township's signature on the written amendment was forthcoming.  (Pang Dep. 247:11-17, 252:17-22; Shulick Dep. 89:19-20)  However, the Township halted progress on the amendment because an election to choose new Commissioners was to occur in May, 2007.  (Pang Dep.

17

247:16-25)  The amendment was never executed.[19]  (Pang Dep.
106:24-107:2; Shulick Dep. 16:21-23)

**E.**

While the amendment to the Redevelopment Agreement was on
hold, the Township was in the midst of a municipal election cycle
that signified a turning point in business relations between the
Township, WDG, and Rose Hill.  That election occurred in May,
2007, and resulted in the installation of a new municipal
government for the Township:  Mayor Randall W. Teague, along with
Commissioners John C. Foley and Paul Dougherty.  (Pl.'s 56.1
Stmt. ¶ 11)

In early 2007, in anticipation of being elected, Teague and
Dougherty met with Rose Hill representatives over lunch.  (Pl.'s
Ex. 6-- Randall W. Teague Dep. (Vol. I) 38:16-39:20, 42:11-20;
Del Duca Dep. 39:9-40:3)  The purpose of that meeting was for
Teague and Dougherty to obtain background information regarding
the Russell Cast property, and to determine what Rose Hill
intended to do with that land going forward.  (Teague Dep. (Vol.
I) 45:1-8)  Teague learned that Rose Hill wished to develop the
property for residential use.  (Teague Dep. (Vol. I) 45:9-13)
Teague and Dougherty did not invite WDG to meet prior to the May

---

[19] The record is conflicted as to whether WDG ever received formal
notice that the Township was not going to execute the amendment.  Pang
testified that she did not "know that [WDG was] ever notified that the
amendment to the redevelopment agreement was not going to be executed."  (Pang
Dep. 253:8-11) Catherine Ward testified that WDG received such notice in
January or February of 2007.  (Ward Dep. 88:20-89:9)

18

election.   (Teague Dep. (Vol. I) 41:15-21)

The sole direct contact between WDG and the new Township administration occurred in July, 2007, at a meeting attended by Joanna Pang, Stephen Pang, Mayor Teague, and former Mayor Park. (Pang Dep. 144:19-145:12)  As described by Pang, the focus of the meeting was on "updating [Mayor Teague] on where the project stood and how the project was now being . . . phased."  (Pang Dep. 146:12-15)  Pang testified that Mayor Teague had little to say during the meeting.  (Pang Dep. 147:1-2)  Following the meeting, Pang called Mayor Teague numerous times to follow-up, but he never responded.  (Pang Dep. 148:4-7, 148:15-18)  By that point, WDG was waiting to move forward with the phased version of the redevelopment project, pending approval by the Township. (Pang Dep. 148:7-9)

The Township notified WDG that it was in default of the Redevelopment Agreement via letter dated November 12, 2007. (Twp. Defs.' Ex. 18-- Ltr. from Catherine Ward to Joanna Pang, Nov. 12, 2007)  Therein, the Township indicated its "frustrat[ion] with the lack of progress" with the Westmont Theater property redevelopment and noted that "the deadlines set forth in the May 26, 2004 Redevelopment Agreement [had] all expired without an approved redevelopment concept being put into motion."  (Id.)  The letter placed WDG on formal notice that it was in default of the Redevelopment Agreement, "on the basis that

19

[WDG] has failed to submit a Redevelopment Project Plan as defined in the Agreement." (Id.) Pursuant to the cure provisions of the Redevelopment Agreement, the letter provided WDG with thirty days to submit a Redevelopment Project Plan.[20] (Id.)

WDG responded to the default notice via a letter from David Shulick dated December 6, 2007. (Twp. Defs.' Ex. 19-- Ltr. from David Shulick to Catherine Ward, Dec. 6, 2007) Attached to the letter was what Shulick described as a "workable concept for the redevelopment of the Theater." (Id.) That "workable concept" was a re-submission of WDG's proposal to phase the redevelopment project — a document which had been shared with the Township months earlier. (Pang Dep. 105:23-106:1) Pang and Shulick both testified that the phasing plan was acceptable under the circumstances, because it was tailored to what the Township had requested. (Shulick Dep. 91:10-15; Pang Dep. 106:4-12) WDG's response also placed the Township on notice that the Township was itself in default of the Redevelopment Agreement.[21] (Shulick

---

[20] The letter also reiterated that the Township would not convey the Westmont Theater property to WDG "except in accordance with the Redevelopment Agreement." (Ward Ltr., Nov. 12, 2007) As explained above, the Redevelopment Agreement executed in 2004 included an "Agreement of Sale," which called for the conveyance of the Westmont Theater property from the Township to WDG, once a number of conditions precedent occurred. *See supra* pt. I, B. On a number of occasions, WDG requested that the Township proceed forward with the conveyance, but the Township declined to do so absent an approved Redevelopment Project Plan. (See Pang Dep. 211:14-23, 259:8-23; Ward Dep. 21:17-22:9; Teague Dep. (Vol. I) 72:13-74:15)

[21] The letter identified six specific defaults by the Township. (Shulick Ltr., Dec. 6, 2007) Those defaults were as follows: (1) failure to amend the Redevelopment Agreement to facilitate the redevelopment of the

Ltr., Dec. 6, 2007)

On December 10, 2007, the Township responded to WDG's correspondence of December 6, 2007.  (Twp. Defs.' Ex. 20-- Ltr. from Catherine Ward to David Shulick and Joanna Pang, Dec. 10, 2007)  Therein, the Township indicated that the phasing plan replicated a prior submission by WDG, and failed to meet the contractual definition of a Redevelopment Project Plan.  (Id.) Via letter dated December 13, 2007, the Township terminated the Redevelopment Agreement with WDG "for failure . . . to cure the default identified in the Township's letter of November 12, 2007."  (Twp. Defs.' Ex. 21-- Ltr. from Catherine Ward to David Shulick and Joanna Pang, Dec. 13, 2007)

During the year following the termination of the Redevelopment Agreement, Rose Hill enjoyed good relations with the Teague administration.  In early 2008, representatives of Rose Hill met with Mayor Teague and Commissioner Dougherty at Tavistock Country Club to discuss the development of the Russell Cast property.[22]  (Del Duca Dep. 53:5-54:2, 54:24-55:4)  During that meeting, representatives of Rose Hill expressed their desire to construct an upscale residential rental project on the land.

---

Westmont Theater; (2) failure to amend zoning ordinances related to parking at the theater; (3) failure to work in good faith under the Redevelopment Agreement; (4) failure to adopt any of the redevelopment plans submitted by WDG; (5) failure to convey title to the Westmont Theater property to WDG; and (6) failure to acquire sufficient parking for the Westmont Theater.  (Id.)

[22] This meeting occurred sometime between February and April of 2008. (See Del Duca Dep. 53:5-54:2 (stating during October 14, 2008 deposition that the meeting at Tavistock occurred "six or eight months ago."))

(Del Duca Dep. 55:19-56:2)  In the months following the Tavistock meeting, Rose Hill and the Township worked collaboratively to design a redevelopment plan for the Russell Cast property.  (See Del Duca. Dep. 69:16-23; Teague Dep. (Vol II) 64:14-65:8)  On September 23, 2008, the Township Commissioners adopted a Resolution which referred a redevelopment plan for the Russell Cast property to the Township Planning Board for consideration. (Del Duca Dep. 66:20-67:23; Teague Dep. (Vol II) 9:11-18)  That redevelopment plan called for high density residential development on the Russell Cast site.  (Del Duca Dep. 67:12-23; Teague Dep. (Vol II) 62:19-63:9)

**F.**

WDG initiated this action by filing a Complaint in December, 2007; the Complaint was amended in January, 2008.  As amended, the Complaint asserts four counts against Defendants, captioned as follows: (1) Breach of Contract; (2) Breach of the Duty of Good Faith and Fair Dealing; (3) Negligent Misrepresentation; and (4) Injunctive Relief.  On April 11, 2008, the parties consented to the entry of an Order imposing temporary restraints on the conveyance of the Westmont Theater property.

The Township Defendants now move for summary judgment and for the dissolution of temporary restraints.[23]  Defendant CCIA

---

[23]  With the express prior permission of the Court, the Township Defendants' two motions rely on the same briefs and much of the same reasoning.

moves to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(c).

## II.

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). "'With respect to an issue on which the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Pub. Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 325). The role of the Court is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

**III.**

The Township Defendants move for summary judgment as to all of WDG's claims.  The Court will address each claim in turn.

**A.**

The operative Complaint articulates seven forms of conduct by which the Township Defendants allegedly breached the Redevelopment Agreement.  (See Amended Compl. ¶ 26(a)-(g))  Those alleged actions are as follows:

(a) Sending false and defamatory communications to a myriad of newspapers and other public venues about [WDG's] activities . . . ;

(b) Publicly and officially opposing any and all plans submitted pursuant to the [Redevelopment Agreement], including Commissioner Hogan attending public meetings and hearings and vocally stating opposition to proposals and touting other redevelopers who were not selected;

(c) Failing . . . to take action to amend its zoning code relating to parking . . . despite knowing at the time that the [Redevelopment Agreement] was executed, that any redevelopment of the theater would require such an amendment . . . ;

(d) Failing to facilitate parking for the Theater . . . . ;

(e) Causing additional delays when finally, after pressure by [WDG], Defendant Township agreed to perform a parking study, ***several years after*** the [Redevelopment Agreement] was signed, instead of prior thereto;

(f) Failing to commit to leasing or acquiring to secure an appropriate parking facility necessary for a feasible use of the Theater as originally intended in the [Redevelopment Agreement] . . . ; and,

(g) Allowing . . . [WDG] to . . . design a "phased in" project and . . . negotiate[] Amendments to the

24

> [Redevelopment Agreement] that were agreed to be
> executed . . . then suddenly refusing to execute the
> Amendment . . . .

(Amended Compl. ¶ 26(a)-(g) (emphasis in original))

To establish a breach of contract under New Jersey law, "a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 392 N.J. Super. 245, 265, 920 A.2d 678 (App. Div. 2007). As stated by the Supreme Court of New Jersey, "[w]hen the terms of [a] contract are clear, it is the function of a court to enforce it as written and not to make a better contract for either of the parties [because t]he parties are entitled to make their own contracts." *McMahon v. City of Newark*, 195 N.J. 526, 545-46, 951 A.2d 185 (2008) (quoting *Kampf v. Franklin Life Ins. Co.*, 33 N.J. 36, 43, 161 A.2d 717 (1960)) (alterations in original).

### (1)

The Township Defendants' moving brief addresses each of the seven purported breaches articulated in the Amended Complaint one-by-one, arguing that none those allegations of breach are supported by evidence in the record. Of equal importance, the Township Defendants assert that none of the actions alleged in the Amended Complaint would violate any provision in the Redevelopment Agreement, even if that conduct had occurred.

According to WDG's sur-reply,[24] the Township breached §§ 2, 6(g),[25] 7(b), and 7(c)[26] of the Redevelopment Agreement.[27] (Pl.'s Sur-Reply Br. 2)  WDG contends that the Township breached those provisions by refusing to convey the Westmont Theater property to

---

[24] WDG filed a sur-reply brief (Dkt. No. 55) without prior permission of the Court, as is required pursuant to Local Civil Rule 7.1(d)(6).  WDG subsequently submitted a letter requesting that the Court consider the sur-reply brief.  (Dkt. No. 58)  Thereafter, CCIA filed a Motion to Strike WDG's sur-reply brief, or in the alternative, for leave to file additional responsive papers.  (Dkt. No. 60)  The Township Defendants joined in CCIA's motion. (Dkt. No. 61)  The Court does not look favorably upon WDG's failure to abide by the Local Civil Rules.  That notwithstanding, the Court has exercised its discretion to consider WDG's sur-reply brief.  The Court has also considered Defendants' responses to WDG's sur-reply brief.
   In addition, following the conclusion of briefing, WDG filed a "supplemental" document, which was accompanied by eighteen exhibits numbered 13 through 30.  (See Dkt. No. 65)  In deciding the instant motions, the Court considered exhibits 13 through 29.
   Exhibit 30 is a document authored by Jeffrey Baron, Esq., a land use attorney retained by WDG.  Although captioned as an expert report, it is little more than a memorandum of law analyzing the merits the instant case.  If WDG wished to incorporate Mr. Baron's legal analysis into its argument, it should have done so in its opposition brief, its sur-reply brief, or during oral argument.  The Court has not considered Exhibit 30 in deciding the pending motions.

[25] WDG's papers do not expressly assert a breach of § 2 of the Redevelopment Agreement.  However, §§ 2 and 6(g) of the Redevelopment Agreement both pertain to the conveyance of the Westmont Theater property to WDG.  Therefore, the Court treats WDG's express allegation that § 6(g) was breached as incorporating an allegation that § 2 was breached.

[26] During oral argument, WDG reaffirmed that the Township's alleged breaches of the Redevelopment Agreement are limited to these provisions.

[27] Nowhere in WDG's initial opposition brief does it pinpoint any provision in the Redevelopment Agreement which the Township Defendants have failed to comply with.  Instead, that filing argues that there is "a material issue of fact regarding the real reasons" why the Township issued a default notice to WDG — namely, the Township's desire to further the interests of Rose Hill in developing the Russell Cast property, at the expense of WDG.  (See Pl.'s Opp. Br. 8, 9, 14)  WDG's opposition brief also contends that the Township was responsible for all delays in the progress of the redevelopment project.  (Pl.'s Opp. Br. 15)  Finally, that filing argues that there is a genuine issue of material fact as to "why [the Township] would knowingly contract with [WDG] to develop the Theater as a theater but not amend its parking ordinances to permit this redevelopment to take place[.]"  (Pl.'s Opp. Br. 22)  These arguments are wholly untethered from the text of the Redevelopment Agreement, and do not show that there is a disputed issue of material fact as to whether a provision of that contract was breached.

WDG, declining to condemn the Russell Cast property for public use, and failing to cooperate with WDG.

First, WDG contends that the Township breached its obligations under §§ 2 and 6(g) of the Redevelopment Agreement by "failing to convey the Theater to [WDG] despite repeated demands[.]" (Pl.'s Sur-Reply Br. 2)  Section 2 provides that "[t]he Westmont Theater Property shall be sold to [WDG] under the terms of the Agreement of Sale . . . attached hereto . . . ." (Redev. Agreement § 2)  Section 6(g) states: "[w]ithin (30) days of receipt of the Permits and Approvals, Redeveloper shall purchase the Westmont Theater Property in accordance with the terms and conditions of the Agreement of Sale . . . ." (Redev. Agreement § 6(g))  Pursuant to the Agreement of Sale, the Township's obligation to convey the Westmont Theater property was contingent upon the ongoing vitality of the Redevelopment Agreement, the consummation of the transaction contemplated therein, and WDG's receipt of all pertinent permits and approvals from the Township. (See Agreement of Sale § 6)  As the redevelopment project contemplated in the Redevelopment Agreement never materialized, and WDG never obtained any permits or approvals from the Township, it follows that the Township was under no obligation to convey the Westmont Theater property to WDG. Therefore, the Township was not in breach of §§ 2 or 6(g) of the Redevelopment Agreement.

27

Next, WDG argues that the Township breached § 7(b) of the Redevelopment Agreement by failing to acquire the Russell Cast property for WDG by the use of eminent domain.  (Pl.'s Sur-Reply Br. 2)  Section 7(b) is captioned "Eminent Domain" and provides, in relevant part: "Township shall acquire any privately-owned lots identified in the Redevelopment Project Plan for which [WDG] has not entered into agreements of sale as of the expiration of the Negotiation Period, as set forth in Section 6.c., above, by Township undertaking all necessary steps . . . ."  (Redev. Agreement § 7(b))

The Township was under no duty to acquire the Russell Cast property.  This conclusion is apparent from the reference to "the expiration of the Negotiation Period" in § 7(b).  The "Negotiation Period" would have begun upon the Township's approval of WDG's Redevelopment Project Plan — an event which never occurred.  (See Redev. Agreement § 6(c) ("Within sixty (60) days after receipt of approval of the Redevelopment Project Plan from the Township, Redeveloper shall have used its best efforts to (1) negotiate with the owners of any privately-owned properties identified in the Redevelopment Project Plan and (2) enter into agreements of sale for the acquisition of such properties (the 'Negotiation Period')."))  In the absence of an approved Redevelopment Project Plan, the Negotiation Period neither commenced nor expired.  Without the expiration of the

28

Negotiation Period, § 7(b) of the Redevelopment Agreement did not impose any obligations on the Township.

Moreover, § 7(b) of the Redevelopment Agreement obligated the Township only to acquire those "privately-owned lots **identified in the Redevelopment Project Plan**[.]" (Redev. Agreement § 7(b) (emphasis added))  The properties identified for inclusion in the Redevelopment Project Plan were Block 21.10, Lots 19, 20, 21, 28, 29, and 30 — none of which is the Russell Cast property.  (Redev. Agreement § 6(c); see Twp. Defs.' Ex. 1 (Attach. A)-- Redevelopment Plan 8 (providing that the Russell Cast property is Block 20.02, Lots 1 through 4 and 24 through 29))  Therefore, the Township was not contractually committed to acquire the Russell Cast land via eminent domain, and did not breach § 7(b) of the Redevelopment Agreement by not doing so.

Lastly, WDG contends that the Township Defendants breached their obligation under § 7(c), entitled "Cooperation."  That subparagraph provides:

> The Township shall cooperate with Redeveloper in its efforts to plan, implement and construct the Redevelopment Project, including but not limited to passing any ordinances or resolutions needed to authorize Township to undertake its obligations under this Redevelopment Agreement.  Nothing herein shall be construed as limiting or pre-determining any decision-making authority of Township as a public entity. However, in the event that Township is unable to undertake actions deemed necessary for the successful completion of the Redevelopment Project or resolution, Redeveloper shall be entitled to modify the Redevelopment Project Plan in such a way as to permit completion of the Redevelopment Project in the absence

29

of such Township actions.  Township shall not be considered in default of this Agreement.

Even in the absence of this express provision, the Township was under an implied contractual obligation to comply with the covenant of good faith and fair dealing.  *See infra* pt. III, B. The Court's analysis *infra* of whether the Township Defendants complied with the covenant of good faith and fair dealing will also reveal whether those defendants abided by their express contractual obligation to cooperate.

(2)

Next, WDG challenges the proposition that it was in indeed in default of the Redevelopment Agreement for failure to submit a Redevelopment Project Plan.  As stated above, a Redevelopment Project Plan includes, at a minimum:

> (i) a detailed Site Plan, as that term is defined in the Zoning Ordinance of Haddon Township; (ii) written description of proposed uses, including various seating capacities and types of entertainment acts to be presented at the Westmont Theater Property, including expected audience capacity for each type of event; (iii) traffic analysis showing adequate parking facilities (either on-site, off-site or both) for maximum seating capacity of the Westmont Theater . . .; and (iv) written description of proposals to minimize impact of light, noise, loitering and off-site parking impacts to the neighboring residential community.

(Redev. Agreement § 1(g))

WDG has articulated no less than three theories which purportedly establish a disputed issue of fact as to whether a Redevelopment Project Plan was submitted to the Township.  Each

30

of WDG's theories must be rejected.

First, prior to initiating this litigation, WDG purported to cure its default by submitting "a workable concept for the redevelopment of the Theater." (Twp. Defs.' Ex. 19-- Ltr. from David Shulick to Catherine Ward, Dec. 6, 2007) The "workable concept" was a proposal to perform the redevelopment project in phases. (See Twp. Defs.' Ex. 19 (Attachment)-- Phasing Proposal) That proposal is scant in its details, and on its face is intended only to "address[] phase 1 in a 3 phased proposal for the redevelopment of the Westmont Theater." (Phasing Proposal 4) Therefore, under no reasonable reading of its language can the phasing proposal be construed as a Redevelopment Project Plan.[28]

Second, via sur-reply brief, WDG asserts that the deposition testimony of Pang and Shulick establishes that a Redevelopment Project Plan was timely submitted. (Pl.'s Sur-Reply Br. 1 (citing Pang Dep. 90-93; Shulick Dep. 24-28)) WDG claims that the support for that deposition testimony is "mysteriously missing as the Agendas and [Meeting Minutes] for the evenings in question for the Planning Board sessions in question are missing . . . ." (Pl.'s Sur-Reply Br. 2)

The testimony of Pang and Shulick is not as unequivocal as portrayed by WDG's sur-reply. The key passages of Pang's deposition are as follows:

---

[28] Nor was the Redevelopment Agreement ever modified to permit WDG to submit a plan other than in accordance with § 1(g).

31

Q: Did you submit a redevelopment project plan within
four months of May 26th, 2004?
A: I do not recall the timing.  It was something that
took, probably did not fall into the time frame that
was required by the agreement.

(Pang Dep. 90:23-91:3)

Q: I'm going to ask you a yes or no question.  Did you
submit a redevelopment project plan as defined in
section 1G of the redevelopment agreement within four
months of May 26th, 2004?
A: I'm going to say that we submitted a plan, and I
don't know what the time frame is.  My best guess is it
was not four months.

(Pang Dep. 91:23-92:5)

The language in Shulick's deposition is similar:[29]

Q: Do you know when [WDG] submitted a redevelopment
project plan as defined by the agreement?
A: That's why I was subpoenaing the records of the
Haddon Township Planning Board, which no one seems to
be able to find.
Q: So the answer is no?
A: I do not know when.  I do not know those dates.
Q: Do you know whether or not . . . a redevelopment
project plan as defined by the agreement was submitted
on behalf of [WDG] before you got involved?
A: I believe there was one, yes.
Q: But you don't know when?
A: Do not know the exact date.

(Shulick Dep. 26:8-25)

Q: Do you know whether your client . . . ever submitted
a redevelopment project plan as defined by the
agreement . . .?
A: I am looking at the definition of redevelopment
project plan on Page 4, item G.
Q: Right.

_____

[29] Notably, the basis for Shulick's testimony about events occurring
during the four months following the effective date of the Redevelopment
Agreement is unclear, given that he was not representing WDG at that time.
(See Shulick Dep. 6:22-7:6 (testifying that his representation of WDG in this
matter began in approximately 2006))

```
A: And it is my understanding that they did.
Q: Before or after you were involved?
A: Before and after.
```

(Shulick Dep. 27:15-28:2)  Such bare representations, wholly
unsupported by documentation,[30] do not create a disputed issue of
material fact as to whether a Redevelopment Project Plan was
submitted to the Township.

Third, under direct questioning of the Court during oral
argument, WDG asserted that a series of documents submitted by
Bach Associates to the Planning Board beginning in March, 2005,
constitute a Redevelopment Project Plan.  As support for that
argument, WDG points to the documents authored by Bach
Associates, Marc Shuster, and Martin Sander of Schoor DePalma
during 2005.[31]

This theory is unavailing for a number of reasons.  First,
the Redevelopment Project Plan was to be submitted to the
Township itself, for review by the Township Commissioners.  The
submissions by Bach Associates to the Planning Board throughout

---

[30] WDG points to Exhibit 13 as supporting the proposition that relevant
plan documents are missing.  However, the top of that single-page document
provides: "PLEASE RETURN **THIS PAGE ONLY** ALONG WITH APPLICATION CHECK MADE
PAYABLE TO THE 'TOWNSHIP OF HADDON.'  RETAIN THE REST OF THIS APPLICATION FOR
YOUR RECORDS."  (Ex. 13-- Township of Haddon- Planning Board Application
(emphasis added))  Thus, the plain text of Exhibit 13 makes clear that the
single-page application was intended to stand alone.

[31] This position was most directly articulated during oral argument.
However, the Court notes that WDG's sur-reply does suggest that a variety of
different documents, submitted at various times, collectively constituted a
Redevelopment Project Plan.  (See Pl.'s Sur-Reply Br. 2)

2005 do not fulfill WDG's obligation to provide a Redevelopment Project Plan to the Township.

Moreover, even if the documents authored by Bach Associates had been submitted to the Township, those documents do not satisfy all aspects of the contractual definition of a Redevelopment Project Plan.  Among other shortcomings, nowhere among those papers is a "written description of proposed uses, including various seating capacities and types of entertainment acts to be presented at the Westmont Theater Property, including expected audience capacity for each type of event[.]" (Redev. Agreement § 1(g)(ii))  Nor do those documents show "adequate parking facilities . . . for maximum seating capacity of the Westmont Theater" as required under § 1(g)(iii) of the Redevelopment Agreement — indeed, WDG never located adequate parking to support its proposed live entertainment venue.

In sum, notwithstanding the importance of §§ 1(g) and 4 in the scheme of the Redevelopment Agreement, WDG has not, in the mass of papers and exhibits submitted to this Court, shown that there is a genuine issue of material fact as to its compliance with those provisions.  No reasonable factfinder could conclude to the contrary.

**B.**

Next, WDG contends that Defendants' conduct breached the covenant of good faith and fair dealing "which is implicit in

every contract[.]" *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 214, 864 A.2d 387 (2005).

In *Brunswick Hills*, the Supreme Court of New Jersey expounded at length upon the subject of "to what extent the covenant of good faith and fair dealing . . . governs the arms-length business transactions of [sophisticated business] entities."[32]  *Id.* at 214, 864 A.2d 387.  It is well-settled that "[e]very party to a contract . . . is bound by a duty of good faith and fair dealing in both the performance and enforcement of [a] contract."  *Id.* at 224, 864 A.2d 387 (citing *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 241, 244, 773 A.2d 1121 (2001)).  Good faith, however, "is a concept that defies precise definition."  *Id.*, 864 A.2d 387.  Among other things, the covenant "calls for parties to a contract to refrain from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract."  *Id.* at 224-25, 864 A.2d 387 (quoting *Palisades Props., Inc. v. Brunetti*, 44 N.J. 117, 130, 207 A.2d 522 (1965)).

---

[32] In *Brunswick Hills*, there was little doubt that the plaintiff-tenant did not abide by the strict contractual terms governing the procedure for exercising an option on a real estate contract.  *See Brunswick Hills*, 182 N.J. at 222-23, 864 A.2d 387.  This was not fatal to the action, however, because "[a] defendant may be liable for a breach of the covenant of good faith and fair dealing even if it does not violat[e] an express term of a contract." *Id.* at 226, 864 A.2d 387 (internal quotation marks omitted) (alteration in original).  Thus, to the extent that the tenant in *Brunswick Hills* had a remedy, it was contingent on establishing that the defendant-landlord violated the covenant of good faith and fair dealing — which the tenant ultimately succeeded in doing.  *See id.* at 223-24, 231-32, 864 A.2d 387.

"Proof of 'bad motive or intention' is vital to an action for breach of the covenant." *Id.* at 225, 864 A.2d 387 (quoting *Wilson*, 168 N.J. at 251, 773 A.2d 1121).

The Supreme Court of New Jersey noted its reticence to "impose a set of morals on the marketplace" and expressed a general preference for "let[ting] experienced commercial parties fend for themselves[.]" *Id.* at 230, 864 A.2d 387.  The Justices recognized that if the covenant is construed too broadly, it "'could become an all-embracing statement of the parties' obligations under contract law, imposing unintended obligations upon parties and destroying the mutual benefits created by legally binding agreements.'" *Id.* at 231, 864 A.2d 387 (quoting *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 92 (3d Cir. 2000)).  Therefore, "an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent an improper motive." *Id.*, 864 A.2d 387. Finally, the Justices stressed that although "a commercial party does not have to act with benevolence towards an opposing party, it cannot behave inequitably." *Id.*, 864 A.2d 387.

The Township Defendants argue that WDG's claim for breach of the covenant of good faith and fair dealing must fail because WDG cannot demonstrate that the Township acted with an improper motive.  In opposition, WDG argues that evidence in the record creates a disputed issue of material fact as to whether Mayor

36

Teague's administration: (1) operated with the purpose of favoring the interests of Rose Hill over those of WDG, and (2) failed to provide a meaningful opportunity for WDG to work with the new administration, prior to defaulting WDG.

Taking the record in the light most favorable to WDG, there is evidence to indicate that, by early 2007, the incoming Teague administration favored Rose Hill's desire to develop the Russell Cast property for high-density residential use, to the indirect detriment of WDG.[33]  There is also evidence that the Teague administration, once elected, was wholly disinterested in moving forward with WDG under the existing Redevelopment Agreement, or in executing the contractual amendment which would have permitted WDG to complete the redevelopment project in phases.  Thus, the issue presented is whether a reasonable factfinder could conclude that these actions, if proven to have occurred, would constitute a breach of the covenant of good faith and fair dealing.

The Court holds that no reasonable factfinder could so conclude for several reasons.  First, there is no dispute that

---

[33] The Township Defendants argue that the Teague administration's business relationship with Rose Hill is irrelevant, insofar as the Redevelopment Agreement did not require the Township to acquire the Russell Cast property for WDG.  Indeed, nothing in the Redevelopment Agreement required the Township to procure the Russell Cast property for WDG's use.  However, by early 2007, it was apparent that the Russell Cast property was the most viable solution to WDG's parking needs, unless WDG abandoned its plan to turn the Westmont Theater into a sizable live entertainment venue.  If Rose Hill was unable to develop the Russell Cast property residentially — which was the case under Mayor Park's administration — Rose Hill was more likely to sell the property.  The good relations Rose Hill enjoyed with the Teague administration encouraged Rose Hill to retain the Russell Cast property for residential development, rather than convey it to a buyer who could turn it into municipal parking.

WDG was at least technically in default of the Redevelopment Agreement for more than two years before the Teague administration took office.  Although the Park administration had chosen to ignore that default, the Redevelopment Agreement was clear that either party's lack of insistence on strict performance did not constitute a waiver of the contract's terms. (See Redev. Agreement § 16(b))  The Redevelopment Agreement was similarly unambiguous that any amendment thereto must be in writing.  (Id.)

Next, insofar as WDG was denied the "benefit of the bargain" contemplated in the Redevelopment Agreement, significant responsibility for that state of affairs rests with WDG itself. As Pang testified, WDG entered into the Redevelopment Agreement knowing that obtaining the requisite parking for the contemplated live entertainment venue posed a challenge.  Long prior to the induction of Teague's administration, WDG tried and failed to resolve the parking issue — first with a plan involving the PATCO parking lot, and later by pursuing an interest in the Russell Cast property from Rose Hill.

Also, critically, the evidence that the Teague administration favored Rose Hill over WDG is unaccompanied by any indication that Teague and his fellow Commissioners had an improper motive for doing so.  WDG has adduced no evidence that the Teague administration was conducting itself other than in

accordance with what they believed to be the best interests of
their constituents.  Moreover, to say that Teague's
administration violated the covenant of good faith and fair
dealing under these circumstances would be to say that his
administration was obligated to blindly follow the policies of
Park's administration towards WDG — policies which had been
unsuccessful in advancing the redevelopment of the Westmont
Theater beyond the planning stages.[34]

   Finally, despite all of the foregoing, WDG still could have
salvaged the Westmont Theater redevelopment project by curing its
default in response to Catherine Ward's letter of November 12,
2007.  WDG had thirty days to effect a cure by submitting a
Redevelopment Project Plan — and longer if a cure could not be
effectuated within that time frame by the exercise of due
diligence.[35]  WDG failed to cure its default.

_____

   [34] Local sentiment provides some indication as to why Teague's
administration may have wished to adopt different methods than their
predecessors.  In endorsing Teague and his running-mates prior to the 2007
election, the editorial board of a Camden County newspaper wrote: "[a]fter
four years of immature infighting, costly legal battles and little progress,
Haddon Township residents finally have a chance to turn the page by voting in
a new board of township commissioners May 8."  *Dougherty, Foley and Teague are
the pick for Haddon Township*, Courier-Post (Cherry Hill, N.J.), Apr. 30, 2007,
§ B, 6G.

   [35] This situation lies in contrast to *Brunswick Hills*, where the
defendant-landlord intentionally waited until its tenant had no possible
recourse under the express provisions of a real estate option contract before
informing the tenant that its attempt to exercise that option nineteen months
earlier was defective.  *See Brunswick Hills*, 182 N.J. at 220, 864 A.2d 387.
The Supreme Court of New Jersey determined that the landlord's tactic of
laying in wait for the option period to expire before informing the tenant of
its non-compliance with the technical terms of the option violated the
covenant of good faith and fair dealing.  *Id.* at 229-30, 864 A.2d 387.

In sum, there is no basis from which a reasonable factfinder could determine that the Township Defendants breached the implied covenant of good faith and fair dealing.  For the same reasons, the Court holds that the Township Defendants did not breach their express contractual obligation to cooperate under § 7(c) of the Redevelopment Agreement.  Summary judgment will be granted to the Township Defendants as to WDG's claims for breach of contract and breach of the covenant of good faith and fair dealing.

**C.**

WDG next alleges that the Township Defendants are culpable for negligent misrepresentations.  Specifically, WDG argues that the Township Defendants made certain representations during the term of the Redevelopment Agreement that resulted in WDG expending funds in reliance thereon.

According to the Township Defendants, this claim fails because New Jersey law does not recognize a cause of action for negligent misrepresentation in the context of this case.  In support of that proposition, the Township Defendants cite this Court's decisions in *Commerce Bancorp, Inc. v. BK Int'l Ins. Brokers, Ltd.*, 490 F.Supp.2d 556 (D.N.J. 2007) (Irenas, J.), and *Diebold, Inc. v. Continental Cas. Co.*, No. 07-1991, 2008 WL 1372948 (D.N.J. Apr. 10, 2008) (Irenas, J.).

In discussing negligent misrepresentation cases, the New Jersey Supreme Court has observed,

>Importantly, the cases do not involve a breach of
>contract claim between parties in privity; rather,
>they involve tort claims by innocent third parties
>who suffered purely economic losses at the hands of
>negligent defendants *with whom no direct
>relationship existed.* Courts have justified their
>finding of liability in these negligence cases based
>on notions of a *special relationship* between the
>negligent tortfeasors and the foreseeable plaintiff
>who relied on the quality of defendants' work or
>services, to their detriment.  The special
>relationship, in reality, is an expression of the
>courts' satisfaction that a *duty of care* existed
>because the plaintiffs were particularly foreseeable
>and the injury was proximately caused by the
>defendant's negligence.

*People Express Airlines v. Consol. Rail Corp.*, 100 N.J. 246,

256-57, 495 A.2d 107 (1985) (emphasis added).  As *People Express*

discusses, common negligent misrepresentation cases include suits

by third-party, non-clients against independent auditors,

attorneys, architects, and notaries public.  *Id.* at 284, 495 A.2d

107.

Similarly, with respect to negligent misrepresentations, the

Restatement (Second) of Torts § 552 provides:

>Information Negligently Supplied *for the Guidance of
>Others*
>
>(1)  One who, in the course of his business,
>profession or employment, or in any other
>transaction in which he has a pecuniary interest,
>supplies false information *for the guidance of
>others in their business transactions*, is subject to
>liability for pecuniary loss caused to them by their
>justifiable reliance upon the information, if he
>fails to exercise reasonable care or competence in
>obtaining or communicating the information.
>
>(2) . . . the liability stated in Subsection (1) is
>limited to loss suffered

41

> (a)  by the person or one of a limited group of persons *for whose benefit and guidance he intends to supply the information* or knows that the recipient intends to supply it; and
>
> (b)  through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(emphasis added).

Both *Commerce Bancorp* and *Diebold* involved the application of the foregoing legal principles.  In both cases, this Court dismissed claims for negligent misrepresentations that allegedly occurred in the context of contractual relationships between commercial entities.  *Commerce Bancorp*, 490 F.Supp.2d at 564; *Diebold*, 2008 WL 1372948, at *7.  As this Court explained in those decisions, a negligent misrepresentation claim is not cognizable as between commercial parties engaged in a direct contractual relationship resulting from arms-length negotiations.[36]  *Commerce Bancorp*, 490 F.Supp.2d at 564; *Diebold*, 2008 WL 1372948, at *7.  No "special duty of care" between the contracting parties exists in such a case.  *Commerce Bancorp*, 490 F.Supp.2d at 564.

This case, like *Commerce Bancorp* and *Diebold*, involves the dealings of sophisticated commercial entities in the context of a

---

[36] *See also Roll v. Singh*, No. 07-4136, 2008 WL 3413863, at *21-*22 (D.N.J. Jun. 26, 2008) (Wolfson, J.) (citing *Commerce Bancorp* and *Diebold* with approval, and dismissing claim for negligent misrepresentation by plaintiff who had substantial bargaining power and direct contractual relationship with defendants).

direct contractual relationship.  No special duty of care existed between WDG and the Township Defendants.  In short, this is not a negligent misrepresentation case.[37]  Therefore, summary judgment will be granted as to WDG's negligent misrepresentation claim.

### D.

The parties previously stipulated to the entry of an order placing temporary restraints on the conveyance of the Westmont Theater property.  As stated above, summary judgment will be granted in favor of the Township Defendants as to all of WDG's claims.  Therefore, the Court will also grant the Township Defendants' motion to dissolve the temporary restraints.[38]

### IV.

For the reasons set forth above, the Court will grant Defendants' motions in their entirety.  The Court will issue an appropriate Order.


Dated: June   15th   , 2009


                                        s/ Joseph E. Irenas
                                        **JOSEPH E. IRENAS, S.U.S.D.J.**

---

[37] WDG's papers do not address the holdings in *Commerce Bancorp* or *Diebold*, or articulate any reason why the rationale of those decisions would not apply with equal force to the instant case.

[38] As stated in the Amended Complaint, and confirmed by WDG during oral argument, WDG is not asserting any affirmative claims against CCIA — notwithstanding any suggestion to the contrary in WDG's sur-reply brief. Therefore, the Court will grant CCIA's Motion to Dismiss.